### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EVANGELICAL LUTHERAN CHURCH IN AMERICA and SUHAIL S. QUMRI,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**IMMIGRATION AND NATURALIZATION SERVICE and UNITED STATES DEPARTMENT OF JUSTICE,**<br><br>    **Defendants.** | **Civil Action 02-01297  (HHK)** |

### MEMORANDUM OPINION

Suhail Qumri, an Israeli-born alien, and Qumri's employer, the Evangelical Lutheran Church in America ("ELCA"), a non-profit religious organization, bring this action against the Immigration and Naturalization Service ("INS" or "Service") and the United States Department of Justice.[1]  Plaintiffs challenge the INS's decision to deny ELCA's application for an extension of Qumri's stay as an H-1B nonimmigrant and also seek to remedy the INS's improper processing of Qumri's I-94 card.

Before this court are defendants' motion to dismiss for lack of jurisdiction or, in the alternative, for summary judgment, and plaintiffs' cross-motion for summary judgment.  Upon consideration of these motions, the oppositions thereto, and the record of this case, the court concludes that plaintiffs' motion for summary judgment must be granted in part, and denied in

---

[1] As of March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192 (Nov. 25, 2002).  Pursuant to this reorganization, the former INS is now called the Bureau of Citizenship and Immigration Services ("BCIS").  For ease of reference, however, the court will refer to the relevant agency as the INS.

part, and defendants' motion must similarly be granted in part and denied in part.

## I.  BACKGROUND

### A.  Factual Background

In June 1998, ELCA hired Suhail Qumri as a Financial Systems Analyst and, approximately two years later, promoted him to his current position, that of Senior Financial Systems Analyst in ELCA's Department of Information Technology.  In December 1998, soon after hiring Qumri, ELCA submitted to the INS an H-1B visa petition on his behalf.  The INS approved the visa petition on April 6, 1999, for a period commencing on April 2, 1999, and ending on November 1, 2001.

An H-1B visa is an employment-based nonimmigrant visa that allows skilled aliens in certain "specialty occupations" to work in the United States for a limited time, under specified conditions.  To qualify as a "specialty occupation," the occupation must require:  (1) the "theoretical and practical application of a body of highly specialized knowledge" in a field of "human endeavor"; and (2) the "attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)."  8 U.S.C. § 1184(i)(1) (2000); *see also* 8 C.F.R. § 214.2(h)(4)(ii) (2003); *Defensor v. Meissner*, 201 F.3d 384, 385-88 (5th Cir. 2000) (explaining H-1B requirements).  Qumri's position as a Senior Financial Systems Analyst qualifies as a "specialty occupation."

Qumri's H-1B visa, and, according to governing regulations, Qumri's lawful stay in the United States, expired on November 1, 2001.  *See* Compl. ¶ 14; 8 C.F.R. § 214.2(h)(13)(i)(A). Under the relevant regulation, Qumri was eligible to apply for an extension of stay at or before

2

the visa's expiration.  H-1B visas can be extended as long as the alien's total period of stay in the

United States does not exceed six years.  § 214.2(h)(15)(ii)(B).  The present controversy arose

because, although Qumri's H-1B petition, and with it his lawful status in the United States,

expired on November 1, 2001, ELCA failed to file a petition for an extension of Qumri's status

until January 4, 2002.[2]  Thus, plaintiffs "allowed the expiration date to pass without taking any

action."  Ex. 4 at 16 (Wright Ltr. to Way, Dec. 27, 2001).

On January 4, 2002, ELCA filed with the INS an untimely H-1B visa extension petition

for beneficiary Qumri.  In this extension petition, ELCA asked the INS to exercise its discretion

to excuse its late filing, pursuant to 8 C.F.R. § 214.1(c)(4).  That regulation provides that an

"extension of stay may not be approved for an applicant who failed to maintain the previously

accorded status or where such status expired before the application or petition was filed."  8

C.F.R. § 214.1(c)(4).  Important for our purposes, however, the regulation includes a safety

valve.  It vests the INS with discretion to excuse an applicant's tardy filing if the applicant shows,

*inter alia*, that the failure to file timely was due to "extraordinary circumstances" beyond the

applicant or petitioner's control and the delay was "commensurate with the circumstances."  *Id.*

In its January 4, 2002, H-1B petition, ELCA urged the INS to utilize this safety valve provision

and approve its request, notwithstanding its late filing.  Ex. 4 at 16 (Wright Ltr. to Way, Dec. 27,

2001).

ELCA's extension petition offered four explanations for its failure to file the H-1B

extension petition on time.  First, according to ELCA, back when Qumri's initial H-1B visa had

---

[2] H-1B visas are generally valid for three years and can be extended for an additional
three-year period.  *See* 8 C.F.R. §214.2(h)(15)(ii)(B)(1); *see also* 8 U.S.C. § 1184(g)(4) (limiting
the term of authorized admission to six years).

been prepared, ELCA had not retained its own counsel and, consequently, "was not advised of the due date for filing for an extension of Mr. Qumri's stay." *Id*. Second, at the time of the initial H-1B filing, ELCA did not have a calendering system to keep track of applicable deadlines. Id. at 15. Third, ELCA stated it was inexperienced with immigration matters because it "employs only two H-1B employees, including Mr. Qumri." *Id*. Finally, ELCA submitted that "Mr. Qumri believed he was in valid H-1B status until April 2002." *Id*.

ELCA's January 4, 2002, H-1B extension petition also included Qumri's Labor Condition Application ("LCA") from the Department of Labor. That was a necessary part of the petition. Under 8 C.F.R. § 214.2(h)(15)(ii)(B)(1), any request for an extension of stay must be accompanied by a "prior certification from the Department of Labor that the petitioner continues to have on file a labor condition application valid for the period of time requested for the occupation." Qumri's LCA was approved on December 12, 2001, valid through October 31, 2004.

On January 7, 2002, the INS sent plaintiffs a letter denying plaintiffs' request for an H-1B extension of stay. In this letter, the INS stated that "it is the alien's responsibility to maintain a valid nonimmigrant status while remaining in the United States." Ex. 5 at 2 (Way Ltr. to ELCA, Jan. 7, 2002). The Service emphasized that the original H-1B approval notice "clearly indicates that [Qumri] was granted H-1B nonimmigrant status from 4/02/1999 to 11/01/2001." *Id*. By plaintiffs' January 4, 2002, filing, Qumri had been out of status for over two months.

In addition, in this initial denial, the INS cited 8 C.F.R. § 214.2(h)(15)(ii)(B)(1), the regulation requiring a valid LCA. The INS stated, essentially, that not only had plaintiffs allowed Qumri's status to lapse, but they had also failed to include a proper LCA in the extension

application.  According to the INS, the "start date of the validity period of the petition does not

correspond with the date specified on the Labor Condition Application" because the petition

period, if approved, would have started on November 1, 2001, while the LCA was not approved

until December 12, 2001, more than one month hence.  *Id*.  The INS's letter also acknowledged

ELCA's cited reasons for its tardiness but did not address whether ELCA's explanation was

sufficient to trigger use of the § 214.1(c)(4) "extraordinary circumstances" safety valve provision.

One month after receiving this initial denial, on February 7, 2002, plaintiffs filed with the

INS a timely Motion to Reconsider or Reopen.  In this petition, ELCA renewed its argument that

its inexperience with H-1B nonimmigrant employees and its failure to use knowledgeable outside

counsel constituted extraordinary circumstances, warranting utilization of the safety valve.

Plaintiffs also argued, for the first time, that following the events of September 11, 2001, Qumri,

a Christian Arab, became "preoccupied" and experienced great stress and anxiety.  This stress,

according to plaintiffs, "contributed to his failure to discover the November 1, 2001, expiration

date of his H-1B petition approval."  Ex. 6 at 12 (Mot. to Reconsider or Reopen, Feb. 7, 2002);

Ex. 8 at 5 (Aff. of Qumri).

In addition, ELCA's Motion to Reconsider placed great emphasis on the INS's improper

processing of Qumri's I-94 card, a fact that plaintiffs briefly discussed in their initial petition but

which was not directly addressed in the INS's initial letter of denial.  The issue arose after Qumri

took a trip to Israel in the Spring of 1999.  At the conclusion of this trip, when Qumri was

reentering the United States on May 4, 1999, the immigration officer at the Chicago port of entry

erroneously stamped Qumri's I-94 card (the card that governs an alien's lawful and unlawful

presence in the United States) with an expiration date of April 27, 2000, not the correct date of

November 1, 2001.  In the Motion to Reconsider, ELCA claimed that this error caused Qumri to

accumulate unlawful presence, starting on April 28, 2000, and that this accumulation of unlawful

presence subjected Qumri to a ten-year reentry bar, pursuant to 8 U.S.C. § 1182(a)(9)(B).[3]

Plaintiffs therefore requested that the INS remedy this oversight by issuing a new I-94 card with a

correct expiration date of November 1, 2001, or by providing a written finding that Qumri was in

lawful status until that time.

> On March 6, 2002, the INS responded and reaffirmed its denial.  The INS provided:

> [T]he fact still remains that the validity of the beneficiary's approved H-1B
> petition expired on November 1, 2001–more than two months prior to filing the
> request for extension of stay.  Thus, after a complete review of the record . . . the
> grounds of denial have not been overcome.

Ex. 7 at 1-2 (Way Ltr. to ELCA, Mar. 6, 2002).  The INS addressed neither plaintiffs'

requests regarding the I-94 card's erroneous expiration date nor ELCA's proffered

explanation for its failure to timely file.

> One month after receiving this second denial, plaintiffs filed with the INS a Notice of

Appeal.  There, plaintiffs challenged four separate actions by the INS:  (1) the INS's failure to

correct Qumri's I-94 card to extend Qumri's lawful stay from April 27, 2000, until November 1,

2001; (2) its refusal to rule that Qumri had not accrued unlawful presence while seeking to

correct the error on Qumri's I-94 card; (3) its conclusion that it lacked the power to extend the

stay of an H-1B nonimmigrant prior to the LCA approval date; and (4) its failure to address

whether the stated reasons for plaintiffs' failure to file the H-1B visa petition within the

---

[3] Under 8 U.S.C. § 1182(a)(9)(B), an alien who is unlawfully present in the United States
for more than 180 days, but less than one year, is barred from reentering the United States for a
period of three years, and an alien with a year or more of unlawful presence is subject to a ten-
year reentry bar.

applicable deadline constituted "extraordinary circumstances" beyond plaintiffs' control, pursuant to § 214.1(c)(4).  Ex. 8 at 1 (Notice of Appeal, Apr. 4, 2002).

On May 16, 2002, the INS responded to plaintiffs' Notice of Appeal.  The INS's letter first stated that a denial of an extension of nonimmigrant stay is not administratively appealable and therefore that the "Appeal" would be treated as a second Motion to Reopen.  The INS's letter then went on to state that plaintiffs' Motion to Reopen was denied on the grounds that Qumri had allowed his H-1B status to expire on November 1, 2001.  The INS reiterated:

> [I]t is the alien's responsibility to maintain a valid nonimmigrant status while remaining in the United States . . . . [and] in spite of counsel's assertions, the fact remains that the validity of the beneficiary's approved H-1B petition expired on November 1, 2001–more than two months prior to filing the request for extension of stay.

Ex. 9 at 2 (Way Ltr. to ELCA, May 16, 2002).

On June 27, 2002, approximately one month after receiving this third denial, plaintiffs filed the instant action, including a request for a preliminary injunction.  On October 3, 2002, the court held a hearing on plaintiffs' motion for a preliminary injunction, and in an oral ruling issued that day, concluded that plaintiffs were entitled to a preliminary injunction to prevent defendants from taking any adverse actions against them during the pendency of the litigation.[4]  Shortly thereafter, defendants filed the instant motion to dismiss, or for summary judgment, and plaintiffs filed their cross-motion for summary judgment.  These motions are currently before this court.

## B.  Legal Background

---

[4] In the interim, on December 2, 2002, defendants filed an interlocutory appeal with the D.C. Circuit.  That appeal was dismissed, on defendants' motion, on April 3, 2003.

In this action, plaintiffs advance two claims.  Plaintiffs first challenge defendants' refusal to grant plaintiffs' petition for an extension of stay, pursuant to 8 C.F.R. § 214.1(c)(4).  Section 214.1(c)(4) provides:

> An extension of stay may not be approved for an applicant who failed to maintain the previously accorded status or where such status expired before the application or petition was filed, except that failure to file before the period of previously authorized status expired may be excused in the discretion of the Service . . . where it is demonstrated at the time of filing that:

>> (i) The delay was due to *extraordinary circumstances beyond the control of the applicant or petitioner, and the Service finds the delay commensurate with the circumstances*;
>> (ii) The alien has not otherwise violated his or her nonimmigrant status;
>> (iii) The alien remains a bona fide nonimmigrant; and
>> (iv) The alien is not the subject of deportation proceedings under section 242 of the Act . . . or removal proceedings under section 240 of the Act.

8 C.F.R. § 214.1(c)(4) (emphasis added).

Plaintiffs claim that the INS found that Qumri, because he was out of status, was not *eligible* for "extraordinary circumstances" relief under the regulation.  Plaintiffs contend that this interpretation of § 214.1(c)(4) is arbitrary and capricious, in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq*.  Furthermore, plaintiffs claim it constitutes a de facto revocation of the regulation without any prior notice or opportunity for public comment, in violation of the APA, the Freedom of Information Act ("FOIA") 5 U.S.C. § 552, and the Due Process Clause.

Second, plaintiffs assert that when Qumri reentered the United States on May 4, 1999, after a brief trip to Israel, the INS Inspector at the port of entry in Chicago erroneously endorsed his I-94 card with an expiration of authorized stay of April 27, 2000, instead of November 1, 2001, as would have been proper.  Plaintiffs contend that in so doing, the INS violated a

mandatory regulation which provides that "a beneficiary [of an H-1B visa] *shall* be admitted to the United States for the validity period of the petition, plus a period of up to 10 days before the validity period begins and 10 days after the validity period ends."  8 C.F.R. 214.2(h)(13)(i)(A) (emphasis added).  This improper endorsement, according to plaintiffs, also constitutes a violation of the APA, FOIA, and the Due Process Clause.  Compl. ¶¶ 43-44.

For the foregoing reasons, plaintiffs seek the following:  (1) a declaration that defendants unlawfully interpreted 8 C.F.R. § 214.1(c)(4); (2) an injunction, compelling defendants to reconsider Qumri's petition for an extension of stay, pursuant to 8 C.F.R. § 214.1(c)(4); and (3) an injunction, compelling defendants to excuse the time Qumri has been in unlawful status, from January 4, 2002, until the final disposition of this lawsuit.

## II.  ANALYSIS

### A.  Summary Judgment Standard

This matter is before the court on defendants' motion to dismiss for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), or, in the alternative, for summary judgment, pursuant to Fed. R. Civ. P. 56, and plaintiffs' cross-motion for summary judgment.

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  But the non-moving party's opposition must consist of more than mere

unsupported allegations or denials and must be supported by affidavits or other competent

evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P.

56 (e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The non-moving party is "required to

provide evidence that would permit a reasonable jury to find" in its favor.  *Laningham v. United

States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not

significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

Summary judgment is an especially appropriate procedural mechanism in this case

because the court's review is based upon the administrative record.  *See Bloch v. Powell*, 227 F.

Supp. 2d 25, 30-31 (D.D.C. 2002); *GCI Health Care Centers, Inc. v. Thompson*, 209 F. Supp. 2d

63, 67-68 (D.D.C. 2002); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)

(citing *Richards v. INS*, 554 F.2d 1173, 1177 n.28 (D.C. Cir. 1977)).

## B.  The INS's Decision

### 1.  Subject Matter Jurisdiction

Plaintiffs primarily seek review of the INS's decision to deny ELCA's request for an H-1B

extension of stay.  The first question to address, then, is whether the court has subject matter

jurisdiction to review the INS's decision and, ultimately, to grant the relief plaintiffs seek.  After

careful analysis, the court is confirmed in the view that it expressed upon granting plaintiffs'

motion for a preliminary injunction:  the court has subject matter jurisdiction over the matter at

hand.

The primary issue here is whether the Illegal Immigration Reform and Immigration

Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 ("IIRIRA") (1996), divests this

court of jurisdiction to review the instant controversy.  The IIRIRA, which amended the

Immigration and Nationality Act, contains a number of provisions limiting judicial review of INS

decisions.  The new scheme is set forth at 8 U.S.C. § 1252.

### a.  8 U.S.C. § 1252(a)(2)(B)(ii)

Defendants first argue that § 306 of the IIRIRA, which amends 8 U.S.C. §

1252(a)(2)(B)(ii), bars this court from reviewing the INS's denial of a nonimmigrant H-1B visa.

Title 8 U.S.C. § 1252(a)(2)(B)(ii), provides:

> Notwithstanding any other provision of law, no court shall have jurisdiction to
> review . . . (ii) any other decision or action of the Attorney General the authority
> for which is specified under this subchapter to be in the discretion of the Attorney
> General . . . .

8 U.S.C. § 1252(a)(2)(B)(ii).  The subchapter referred to is subchapter II of Chapter 12 of Title 8,

which covers § 1151 through § 1378.  Section 1184, which falls squarely within this subchapter,

governs the admission of nonimmigrants, including H-1B nonimmigrants.  Specifically, § 1184

provides: "The admission to the United States of any alien as a nonimmigrant shall be for such

time and under such conditions as the Attorney General may by regulations prescribe."  8 U.S.C.

§ 1184(a)(1).  Title 8 C.F.R. § 214.1(c)(5), which governs the extension of H-1B visas and

explicitly vests their extension in the "discretion of the Service," was promulgated pursuant to §

1184.

Given these readings, it appears that decisions made pursuant to § 214.1(c) fall squarely

within the Attorney General's discretion and are therefore insulated from judicial review by 8

U.S.C. § 1252(a)(2)(B)(ii).  In *CDI Information Services, Inc. v. Reno*, 278 F.3d 616 (6th Cir.

2002), a case also involving an H-1B visa extension petition, the Sixth Circuit indeed embraced

that view, and held that § 1252(a)(2)(B)(ii) eliminates judicial review of discretionary decisions

made by the Attorney General, regardless of whether those decisions are made outside of the removal context.  In so finding, the Sixth Circuit is not alone.  A number of courts have broadly interpreted § 1252(a)(2)(B)(ii), and have concluded that "[d]ecisions that are specified under the Immigration and Nationality Act to be under the discretion of the Attorney General are not reviewable."  *Systronics Corp. v. INS*, 153 F. Supp. 2d 7, 10-11 (D.D.C. 2001); *see also, e.g., Van Dinh v. Reno*, 197 F.3d 427, 432 (10th Cir. 1999); *ANA Int'l Inc. v. Way,* 242 F. Supp. 2d 906, 921 (D. Or. 2002); *Saccoh v. INS*, 24 F. Supp. 2d 406, 409-10 (E.D. Pa. 1998).

Other courts disagree, however.  While only *CDI Information Services* has analyzed whether § 1252(a)(2)(B)(ii) divests courts of jurisdiction to review the Attorney General's decisions regarding H-1B visa extensions, other courts have examined the provision's jurisdictional bar in similar contexts and have concluded that §1252(a)(2)(B)(ii) applies only to final orders of removal, not to other discretionary decisions.  *See, e.g., Abboud v. INS*, 140 F.3d 843, 846-47 (9th Cir. 1998); *Calexico Warehouse, Inc. v. Neufeld*, 259 F. Supp. 2d 1067, 1072-75 (S.D. Cal. 2002); *Nyaga v. Ashcroft,* 186 F. Supp. 2d 1244, 1249 (N.D. Ga. 2002), *vacated on other grounds*, 323 F.3d 906 (11th Cir. 2003); *Talwar v. INS*, 2001 WL 767018, at *3-4 (S.D.N.Y. July 9, 2001); *Mart v. Beebe*, 94 F. Supp. 2d 1120, 1124 (D. Or. 2000); *Shanti, Inc. v. Reno*, 36 F. Supp. 2d 1151, 1159 (D. Minn. 1999) (holding that § 1252(a)(2)(B)(ii) did not "strip this Court of jurisdiction to review the denial of the H-1B nonimmigrant visa"); *Burger v. McElroy*, 1999 WL 203353, at *4 (S.D.N.Y. Apr. 12, 1999) (noting that defendants "concede" that §1252(a)(2)(B) only applies when a removal order has been issued); *Dominance Indus., Inc. v. INS*, 1998 WL 874904, at *1-2 (W.D. Tex. Nov. 24, 1998).  In concluding that §1252(a)(2)(B)(ii) applies only in a limited context, courts have relied primarily on the fact that §

1252 is titled "Judicial Review of Orders of Removal."  *E.g., Shanti, Inc.* 36 F. Supp. 2d at 1158;

*Mart*, 94 F. Supp.2d at 1124; *Burger*, 1999 WL 203353, at *4.  As many courts have found, this

title certainly suggests that the provision applies only once removal proceedings have begun.

Because there is ample case law to support either interpretation of § 1252, and the D.C.

Circuit has not yet ruled, the court must embark on its own analysis.  In interpreting § 1252 in a

non-removal context, the court confronts conflicting canons of statutory construction.  One well-

established canon of statutory construction militates against a finding of jurisdiction.  This canon

provides that the title of a statute or statutory section, which a number of courts have relied upon,

generally cannot be used to constrict a statute's plain language.  In *Trainmen v. Baltimore & Ohio

Railroad*, 331 U.S. 519, 528-29 (1947), the Supreme Court explained:

> Where text is complicated and prolific, headings and titles can do no more than
> indicate the provisions in a most general manner. . . .  For interpretive purposes,
> they are of use only when they shed light on some ambiguous word or phrase.
> They are but tools available for the resolution of doubt.  But they cannot undo or
> limit that which the text makes plain.

331 U.S. at 528-29; *see also  Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 822 (D.C.

Cir. 2001) (noting that courts are reluctant to give "great weight to statutory headings"); *Nat'l

Ctr. for Mfg. Sciences v. Dep't of Def.*, 199 F.3d 507, 511 (D.C. Cir. 2000) ("[t]he plain meaning

of a statute cannot be limited by its title").  In finding that it lacked jurisdiction to review the

Attorney General's H-1B visa extension decision, the Sixth Circuit relied upon *Trainmen* and the

inarguable complexity of § 1252 to find that the statute's heading should not be read to contradict

the statute's plain meaning.  *CDI Info. Services, Inc.*, 278 F.3d at 619-20.

At the same time, however, three well-established canons of statutory construction

support this court's assertion of subject matter jurisdiction.  First, it is well established that

13

congressional intent to limit a court's jurisdiction must be "clear and convincing" before a court

will limit a petitioner's access to judicial review. *Bd. of Governors of Fed. Reserve Sys. v.*

*MCorp. Fin. Inc.*, 502 U.S. 32, 44 (1988); *see also Traynor v. Turnage*, 485 U.S. 535, 542

(1988) (plurality opinion); *Morris v. Gressette,* 432 U.S. 491, 501 (1977); *Abbott Laboratories v.*

*Gardner*, 387 U.S. 136, 140 (1967); *Rusk v. Cort*, 369 U.S. 367, 379-80 (1962); *Int'l Ladies'*

*Garment Workers' Union v. Donovan*, 722 F.2d 795, 807 (D.C. Cir. 1983).  Second, the Supreme

Court has provided that courts interpreting immigration statutes should resolve any ambiguity in

favor of the alien.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); *INS v. Errico*, 385 U.S.

214, 225 (1966); *Costello v. INS*, 376 U.S. 120, 128 (1964).  And third, there is a general

presumption in favor of judicial review of administrative acts.  *INS v. St. Cyr*, 533 U.S. 289, 298-

99 (2001); *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 498 (1991); *Dunlop v.*

*Bachowski*, 421 U.S. 560, 567 (1975).  One may argue, then, by including the heading "Judicial

Review of Orders of Removal," Congress failed to speak clearly and therefore failed to limit

immigrants' access to judicial review of discretionary decisions in the non-removal context.

  Given this ambiguous statutory language, discordant authority, and the conflicting canons

of statutory construction underpinning the authority, the court shall consider the statute's

legislative history.  *Blum v. Stenson*, 465 U.S. 886, 896 (1984) (when "resolution of a question of

federal law turns on a statute and the intention of Congress, we look first to the statutory

language and then to the legislative history if the statutory language is unclear").  That history

compels the conclusion that § 1252(a)(2)(B) only forecloses judicial review in the removal,

exclusion, and deportation contexts.  Significantly, the relevant House Conference Report

provides: "Section 306 [codified at §1252(a)] . . . limits the authority of Federal courts other than

the Supreme Court to enjoin the operation of the new removal procedures established in this

legislation." H.Rep. No. 104-469, pt. I, at 161 (1996).  In addition and more significantly,

another House Conference Report provides that § 306 "shall apply without limitation to claims

arising from all past, pending, or future exclusion, deportation, or removal proceedings under

such Act." H.Rep. No. 104-828, at 67 (1996).  Finally, and most tellingly, § 306's legislative

history never refers to visa petitions or any other procedures outside the removal, exclusion, and

deportation contexts.  *See Shanti, Inc.* 36 F. Supp. 2d at 1158.  From there the court merely notes

that "[t]he disposition of a visa petition has been held to be a collateral issue not within the scope

of deportation, removal, or exclusion proceedings." *Id*. at 1159 (citing *Hassan v. INS*, 110 F.3d

490, 494 (7th Cir. 1997); *Pritchett v. INS*, 993 F.2d 80, 82 (5th Cir. 1993); *Conti v. INS*, 780 F.2d

698, 702 (7th Cir. 1985); *Elbez v. INS*, 767 F.2d 1313, 1314 (9th Cir. 1985); *Dastmalchi v. INS*,

660 F.2d 880, 891 (3d Cir. 1981)).

　　　Had Congress intended to strip from federal courts the power to review all discretionary

decisions of the Attorney General regarding immigration matters, Congress could have made its

intent plain.  *See McNary*, 498 U.S. at 494; *Yu v. Brown*, 36 F. Supp. 2d 922, 934 (D. N.M.

1999).  Here, Congress did not do so, and without a clear statement, the court will not find that

Congress intended to divest federal courts of such fundamental power.

### b.  8 U.S.C. § 1252(g)

　　　Defendants next assert that, even if the court has jurisdiction to review the merits of the

controversy, under 8 U.S.C. § 1252(a), the court has no jurisdiction to grant the relief plaintiffs

seek.[5]  Defendants direct the court to 8 U.S.C. § 1252(g), which provides:  "no court shall have

jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or

action by the Attorney General to commence proceedings, adjudicate cases, or execute removal

orders against any alien under this chapter."  8 U.S.C. § 1252(g).  Defendants claim that §

1252(g) applies quite broadly–and is sufficiently broad to bar the court's consideration of this

action.

        The only case defendants cite in support of their broad reading of § 1252(g) is *Reno v.*

*American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482-83 (1999).  If anything,

however, that case commands a "narrow interpretation" of § 1252(g).  *Fornalik v. Perryman*, 223

F.3d 523, 531 (7th Cir. 2000); *see also Sabhari v. Reno*, 197 F.3d 938, 942 (8th Cir. 1999) (stating

that while 1252(g) "might have been thought to cut quite a broad swath, the Supreme Court held

to the contrary in *Reno v. American-Arab Discrimination Committee*").  In *American-Arab*, the

Supreme Court held that: "[§ 1252(g)] applies only to [judicial review of] three discrete actions

that the Attorney General may take:  her 'decision or action' to '*commence* proceedings,

*adjudicate* cases, or *execute* removal orders.'"  *American-Arab*, 525 U.S. at 482 (emphasis in

original).  Because those three terms are to be read "narrowly and precisely," *Sabhari,* 197 F.3d

at 942, § 1252(g) does not proscribe review over even the generality of deportation matters, *Shah*

_____

        [5] In advancing this argument, defendants state that "[t]he ultimate relief sought by the
plaintiffs is for [sic] an injunction precluding the Immigration and Naturalization Service from
initiating removal proceedings against Qumri based on his having [sic] to maintain his lawful
status."  Defs.' Mot. to Dismiss at 6-7.  The court notes, however, that defendants' statement is
somewhat disingenuous.  While the preliminary injunction entered in this case enjoined the INS
from initiating removal proceedings against Qumri during the pendency of this litigation,
plaintiffs nowhere ask for a *permanent* injunction, precluding the INS from taking such action.
*See* Pls.' Opp'n to Defs.' Mot. at 9-10.

*v. Reno*, 184 F.3d 719, 722 (8th Cir.1999), much less other collateral decisions, which may be reached on the path to such action.  *See, e.g., Sabhari*, 197 F.3d at 942; *Shanti, Inc.*, 36 F. Supp. 2d 1151; *Paunescu v. INS*, 76 F. Supp. 2d 896, 899 (N.D. Ill. 1999); *Dominance Indus., Inc. v. INS*, 1998 WL 874904, at *2 (N.D. Tex. Nov. 24, 1998).

In this case, no decision to commence removal proceedings has yet been made and no removal order has been executed.  Thus, defendants' invocation of § 1252(g) is as futile as their invocation of § 1252(a).  This court has jurisdiction to entertain plaintiffs' claim and provide appropriate relief.

### 2. Reviewability

Defendants next submit that, even if the court has jurisdiction to adjudicate this controversy, the court may still not reach the merits of plaintiffs' first claim, concerning the denial of plaintiffs' request for an extension of stay.  This is so, defendants contend, because the question of whether "extraordinary circumstances . . . commensurate with the delay" exist, pursuant to 8 C.F.R. § 214.1(c)(4) is committed to the INS's sole discretion.  In so arguing, defendants rely upon 5 U.S.C. § 701(a), which provides that judicial review of agency action pursuant to the APA may not be had where, *inter alia*, "agency action is committed to agency discretion by law."

In applying 5 U.S.C. § 701(a), however, there is a strong presumption in favor of judicial review of administrative actions.  *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *Bartlett v. Bowen*, 816 F.2d 695, 699 (D.C. Cir. 1987).  Absent an explicit statutory bar, judicial review pursuant to the APA is available except "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Webster v.*

*Doe*, 486 U.S. 592, 599 (1988) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)), and "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

This is such a rare case, defendants submit, because 8 C.F.R. § 214.1(c)(4) contains the undefined term "extraordinary circumstances," which, they contend, contains no judicially manageable standard by which a court could determine whether the INS properly exercised its discretion. *Cf. Calle-Vujiles v. Ashcroft*, 320 F.3d 472, 474 (3d Cir. 2003) (holding that the INS's refusal to utilize its *sua sponte* power to reopen deportation proceedings in "exceptional circumstances" is a matter shielded from judicial review); *Ekimian v. INS*, 303 F.3d 1153 (9th Cir. 2002) (same); *Luis v. INS*, 196 F.3d 36, 40-41 (1st Cir. 1999) (same).

To begin, the court is skeptical of defendants' claim that the term "extraordinary circumstances" is so vague as to be unreviewable.[6] *See Bartlett*, 816 F.2d at 699; *Robbins v. Regan*, 780 F.2d 37, 45 (D.C. Cir. 1985) ("The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely nonreviewable . . . unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised."); *cf. Beno v. Shalala*, 30 F.3d 1057, 1067 (9th Cir. 1994) ("The granting of an exemption from statutory requirements is not an area of agency

---

[6] The rulings in *Calle-Vujiles, Ekimian*, and *Luis* appear to rest on the fact that, in those cases, the court was poised to review the INS's decision to decline to exercise its *sua sponte* power. This case is thus readily distinguishable. *Compare Ekimian*, 303 F.3d at 1158-59, *with Socop-Gonzalez v. INS*, 208 F.3d 838, 845 (9th Cir. 2000) ("we are confident of our ability to evaluate whether a particular case presents an 'exceptional situation'") (citing *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1403 (D.C. Cir. 1995)); *Lopez v. INS*, 184 F.3d 1097, 1100 (9th Cir. 1999) (stating that fraud is an exceptional circumstance); *Sharma v. INS*, 89 F.3d 545, 547 (9th Cir. 1996) (holding that traffic delays do not constitute exceptional circumstances).

discretion traditionally unreviewable. . . .") (internal quotation and citation omitted).  Even

assuming *arguendo* the claim's validity, however, defendants' effort to escape judicial review

cannot succeed.

For reasons explained in more detail below, in this case, the court does not find fault with

the INS's *exercise* of discretion.  Rather, the court rejects the INS's potential *refusal* to exercise

the discretion with which it was endowed.  As to the question of reviewability, while it may not

be able to quarrel with an INS determination that there are no "extraordinary circumstances . . .

commensurate with the delay" sufficient to mandate utilization of § 214.1(c)(4)'s safety valve

provision, the court may, at the very least, ask whether the INS recognized its ability to utilize

that instrument.  *See Carranza v. INS*, 111 F. Supp. 2d 60, 63 (D. Mass. 2000), *rev'd on other*

*grounds*, 277 F.3d 65 (1ˢᵗ Cir. 2002) ("[A]lthough this district court [may not be able to] review

the decision the INS reaches after exercising its discretion, this court can require that the INS

exercise its discretion rather than deciding it has no discretion."); *accord United States ex rel.*

*Accardi v. Shaughnessy,* 347 U.S. 260, 268 (1954) (distinguishing between the failure to use

discretion and the exercise of same); *cf. Stehney v. Perry*, 101 F.3d 925, 933 (3d Cir. 1996)

(noting that, although a decision may be "committed to agency discretion by law," a court may

still review the decision to determine whether the agency followed its own regulations in

reaching the result).  Because defendants fail to distinguish between the exercise of discretion

and the refusal to use discretion at all, defendants' first argument concerning reviewability is

without merit.

In yet another attempt to shield this matter from judicial scrutiny, defendants provide that

this matter is immune from judicial review because, under § 214.1(c)(4), "even if an applicant

shows that the circumstances causing his delay were extraordinary, and the delay was commensurate with the circumstances, the INS retains the discretion to deny a stay."  Defs.' Mot. to Dismiss at 12 (citing § 214.(c)(4) ("failure to file before the period of previously authorized status expired *may* be excused in the discretion of the Service")).  In so arguing, defendants seize on the word "may," rather than "shall," in the operative regulation.  Defendants thus assert:  "Use of the term 'may' prevents judicial ascertainment and evaluation of the reasons why the Immigration and Naturalization Service may decline to grant an extension of stay where an application shows extraordinary circumstances that were beyond his control and that the delay was commensurate with the circumstances."  *Id*. at 12-13.

The court disagrees.  In *Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995), our Circuit court addressed, and squarely rejected, a proposition similar to the one defendants advance here.  In *Dickson*, the court held:

> When a statute uses a permissive term such as "may" rather than a mandatory term such as "shall," this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show *deference* to the agency's determination.  However, such language does not mean the matter is *committed* exclusively to agency discretion.

*Dickson*, 68 F.3d at 1402 (emphasis in original).  *See, e.g., Mulloy v. United States,* 398 U.S. 410, 414 (1970) (holding that statute providing that Selective Service boards "may reopen" draft classifications does not permit a board to elect not to reopen classification where an applicant has presented *prima facie* case for a new classification); *accord Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 348 (4th Cir. 2001) ("[L]anguage allowing for discretion does not create unlimited discretion."); *Appalachian Power Co. v. EPA*, 135 F.3d 791, 807 (D.C. Cir. 1998); *Socop-Gonzalez v. INS*, 208 F.3d 838, 844 (9th Cir. 2000) ("'[T]he mere fact that a statute contains

20

discretionary language does not make agency action unreviewable.'") (quoting *Beno v. Shalala*, 30 F.3d 1057, 1066 (9ᵗʰ Cir. 1994)); *Envtl. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 590 n.9 (D.C. Cir. 1971); *Envtl. Def. Fund v. Hardin*, 428 F.2d 1093, 1098 (D.C. Cir. 1970) (intent to preclude judicial review "cannot be found in the mere fact that a statute is drafted in permissive rather than mandatory terms").  Accordingly, 8 C.F.R. § 214.(c)(4)'s use of the word "may" is insufficient to preclude judicial review of decisions made pursuant to that regulation.

For the foregoing reasons, the court thus finds that the INS's decision in this case is subject to judicial review such that the court may–at the very least–determine whether the INS applied the correct regulation and exercised its discretion, rather than ignoring its discretion altogether.  The court may therefore proceed to consider the merits of the instant controversy.

## C.  Substantive Claims

### 1.  The Denial of an Extension of Stay

We first turn to the INS's denial of plaintiffs' untimely petition for an extension of stay. Plaintiffs assert that the INS's decision was arbitrary and capricious, in violation of the Administrative Procedures Act.[7]

Defendants, on the other hand, take three positions.  First, defendants argue that the INS had discretion to grant Qumri's application for an extension of stay, properly exercised its discretion, and denied plaintiffs' petition.  Toward that end, defendants assert:  "The Service considered plaintiff Qumri's request for a waiver of his ineligibility but concluded that the stated reasons were neither extraordinary nor beyond the plaintiffs' control."  Defs.' Mot. to Dismiss at

---

[7] Plaintiffs also assert that the INS violated the due process clause and FOIA.  Because the court finds that the INS violated the APA, the court declines to consider plaintiffs' other claims.

21

4-5; *see id.* at 16 ("The Service concluded that the plaintiffs' asserted reasons for missing the November 1, 2001, deadline amounted to ordinary negligence that was not beyond their control."); Defs.' Opp'n to Pls.' Mot. for Summ. J. at 7 ("The Service found that the circumstances Qumri cited for his delay in filing his application for an extension of stay were not extraordinary. . . .").

At other times, however, defendants assert that the INS was *unable* to exercise its discretion to grant plaintiffs' request because plaintiffs failed to provide a valid Labor Condition Application, as required by 8 C.F.R. § 214.2(h)(15)(ii)(B)(1).  This failure, according to defendants, "*prevented* [the INS] from approving the extension of stay" and served as "an independent basis for denial of the extension of stay."  Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. at 13 (emphasis added).  The INS apparently took this position in its initial January 7, 2002, letter of denial.  This denial states:

> [T]he start date of the validity period of the petition does not correspond with the date specified on the Labor Condition Application.  Therefore, we are *unable* to approve the requested extension of stay on the beneficiary's behalf.  The extension of stay is hereby denied pursuant to 8 C.F.R. 214.2(h)(15)(ii)(B)(1).

Ex. 5 at 2 (Way Ltr. to ELCA, Jan. 7, 2002) (emphasis added).

Third and finally, at other times, it appears that the INS blithely ignored its ability to utilize 8 C.F.R. § 214.1(c)(4) and its corresponding obligation to consider whether the grounds set forth by plaintiffs constituted "extraordinary circumstances" sufficient to trigger § 214.1(c)(4)'s safety valve provision.  This view is evident in the INS's denial of plaintiffs' first and second Motions to Reopen.  In those opinions, the INS merely stated:  "The requested extension of stay was denied because the petitioner failed to establish that the beneficiary was

22

maintaining valid nonimmigrant status at the time the instant petition was filed." Ex. 7 (Way Ltr. to ELCA, Mar. 6, 2002); Ex. 9 (Way Ltr. to ELCA, May 16, 2002). These statements certainly make it appear that the INS did not consider the possibility of excusing the untimeliness of plaintiffs' application. *See* Defs.' Mot. to Dismiss at 10 ("By the time Qumri sought a stay [sic] in January 2002, he had failed to maintain his previously accorded status and, under the regulation, *the INS could not approve*, and therefore properly denied, his request for an extension of his stay.") (emphasis added).

Defendants' positions are plainly inconsistent. The INS either had discretion to grant plaintiffs' petition and extend Qumri's stay, pursuant to 8 C.F.R. § 214.1(c)(4), or it was "prevented" from doing so, either because the application lacked a valid LCA or because petitioner Qumri was out of status. The court is troubled by the INS's failure to explain adequately its result.

True, under the Administrative Procedures Act, courts review INS actions to determine whether the INS acted arbitrarily or capriciously or abused its discretion. 5 U.S.C. § 706(2)(A). This review is quite deferential. Generally, courts "must presume the validity of agency action," *Kisser v. Cisneros*, 14 F.3d 615, 618 (D.C. Cir. 1994) (citing *Am. Horse Prot. Ass'n, Inc., v. Yeutter*, 917 F.2d 594, 596 (D.C. Cir. 1990)), and an agency's decision need not "be a model of analytic precision to survive a challenge," *Dickson v. Sec'y of Def.* 68 F.3d 1396, 1404-05 (D.C. Cir. 1995). It is also the case that when evaluating the propriety of INS decisions, because power over aliens is political in nature, extra deference is due. *Nikoi v. Attorney General*, 939 F.2d 1065, 1068 (D.C. Cir. 1991) (citing *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101-02 n.21 (1976)); *see also Systronics Corp. v. INS*, 153 F. Supp.2d 7, 14 (D.D.C. 2001).

It is equally clear, however, that "[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Burlington Truck Lines, Inc. v. United* States, 371 U.S. 156, 168 (1962); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001).  An agency must therefore "take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990).  "It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *Harborlite Corp. v. I.C.C.*, 613 F.2d 1088, 1093 (D.C. Cir. 1979) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947)).  If an agency merely "parrots the language of a statute" without providing a rational–much less reasoned–explanation for its result, the agency has not met its burden.  *Dickson*, 68 F.3d at 1404-1405; *accord A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995) (noting that an agency's explanation for its action must be sufficient to enable the court to "conclude that the agency's action was the product of reasoned decision making") (internal quotation and citation omitted).

.      In this case, defendants have never satisfactorily explained whether the INS:  (1) had discretion to excuse plaintiffs' late filing and exercised it or (2) had no discretion and acted accordingly.[8]  Moreover, the administrative record never demonstrates that, even assuming the

---

[8] The court is not free to supply its own rationale for the agency's decision, not provided by the agency itself.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Mayo v. INS*, 921 F.2d 177, 179

INS had discretion, it actually evaluated plaintiffs' petition under the appropriate standard, as set

forth in § 214.1(c)(4).  While defendants *now* claim that "plaintiffs failed to satisfy the

Immigration and Naturalization Service that the delay was due to extraordinary circumstances

beyond their control," Defs.' Opp'n to Pls.' Mot. for Summ. J. at 7, the administrative record, on

which the court must rely,[9] is devoid of any indication that the INS specifically considered

plaintiffs' proffered explanation for the delay and found it wanting.

Because the court cannot discern the path that led to the INS's decision in this case, the

court cannot uphold the agency's determination.[10]  *See, e.g., Dickson*, 68 F.3d at 1407 (finding

that an agency decision which only listed the facts and conclusions, "but did not connect them in

---

(8th Cir. 1990); *Harborlite Corp. v. I.C.C.*, 613 F.2d 1088, 1092 n.8 (D.C. Cir. 1979).

[9] The court must base its decision on the grounds articulated by the agency at the time of the decision, not agency counsel's post-hoc rationalizations, offered during the course of litigation.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988); *Burlington Truck Lines v. United* States, 371 U.S. 156, 168 (1962); *Mayo v. Schiltgen*, 921 F.2d 177, 179 (8th Cir. 1990) ("[a] court must consider the agency's [contemporaneous] rationale for its decision"); *World Wildlife Fund v. Hodel*, 1988 WL 66193, at *2 (D.D.C. June 17, 1988) (noting that a court may not "accept *post hoc* rationalizations" for an agency decision); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1241 n.11 (D.D.C. 1986) (same).

[10] In so doing, the court emphasizes that it is troubled by the apparent deficiency of the INS's decision-making process; the court expresses no view as to whether the INS's ultimate decision to deny Qumri's petition for an extension of stay was correct.  *See Dickson*, 68 F.3d at 1405 (citing *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1513-14 (D.C. Cir. 1989)).  The court, then, must deny plaintiffs' request that it set aside the INS's action for failing to strike "a fair balance between the character of the act committed and the consequences which flow from it." Pls.' Mot. for Summ. J. at 22, 25 (quoting *Mashi v. INS*, 585 F.2d 1309, 1315-17 (5th Cir. 1978)). *Cf. Goncalves v. Reno*, 144 F.3d 110, 125  (1st Cir. 1998).  The court must similarly deny plaintiffs' request that it "[d]eclare that defendants' interpretation of 8 C.F.R. § 214.1(c)(4) added two impossible-to-satisfy eligibility criteria, without affording the required notice and opportunity for public comment."  Compl. ¶ 53; Pls.' Mot. for Summ. J. at 20-21.  Because the court cannot determine what factors entered into the INS's decision, the court cannot say that improper factors were countenanced.

any rational way" was arbitrary and capricious); *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1324 (D.C. Cir. 1991) (refusing to accept an agency decision because the agency failed "to explain the path it had taken").  Because the INS has not adequately explained the reasons for its denial, the court shall grant judgment for plaintiffs and remand plaintiffs' petition for an H-1B extension of stay to the INS for further explanation or reconsideration.  *Florida Power & Light v. Lorion*, 470 U.S. 729, 744 (1985); *Tourus Records, Inc*, 259 F.3d at 737.

### 2. The I-94 Claim

The court now turns to plaintiffs' second and final claim.  Here, plaintiffs contend that the immigration inspector in Chicago erred when he stamped Qumri's I-94 card with an improper validity date of April 27, 2000, and that the Service compounded that error when it initially ignored plaintiffs' request for a determination that Qumri's stay in the United States was lawful until November 1, 2001.

Defendants, in response, concede that the INS inspector erred when he stamped Qumri's I-94 card with an improper validity date of April 27, 2000, and further acknowledge that Qumri's stay was, and always has been, lawful until November 1, 2001.  *See* Defs.' Mot. to Dismiss at 3 ("Defendants concede that the validity of the H-1B petition and, according to the governing regulations, Qumri's lawful stay expired on November 1, 2001.").  Defendants contend, however, that, notwithstanding the INS's error, plaintiffs' I-94 claim is now moot because the error has been recognized and remedied.[11]

---

[11] Defendants advance two other arguments as well.  First, defendants contend that they recognized and remedied the error long ago.  Specifically, defendants point to the INS's *initial* January 7, 2002, letter of denial which stated:  "[The beneficiary] was granted an authorized period of stay *until November 1, 2001*."  Ex. 5 at 2 (Way Ltr. to ELCA, Jan. 7, 2002) (emphasis added). Second, defendants assert that if the above remedy was insufficient, in light of the INS's

Plaintiffs, meanwhile, acknowledge that "the I-94 error is now corrected." Pls.' Reply in Supp. of Mot. for Summ. J. at 2. Plaintiffs assert, however, that notwithstanding the fact that the error has been remedied, their claim concerning the I-94 card continues to present a live controversy because they are continuing to suffer prejudice resulting from defendants' conduct. *Id*.

The mootness doctrine limits Article III courts to deciding "actual, ongoing controversies." *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002) (quoting *Clarke v. United States*, 915 F.2d 699, 700-01 (D.C. Cir. 1990) (in turn quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). A case is moot if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more- than-speculative chance of affecting them in the future." *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990); *accord Pub. Util. Comm'n of California v. FERC*, 236 F.3d 708, 714 (D.C. Cir. 2001).

Although the mootness question in this case is somewhat slippery, the court concludes that plaintiffs' second claim is moot because the I-94 card violation has already been remedied

---

*explicit* recognition of the error during proceedings pursuant to plaintiffs' motion for a preliminary injunction, plaintiffs could–and should–have availed themselves of the available administrative remedy to cure the error prior to filing their motion for summary judgment. *Cf. McKart v. United States*, 395 U.S. 185, 195 (1969) ("notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors"). According to defendants, the INS Inspector's Field Manuel provides a specific procedure for the correction of erroneous admissions, that plaintiffs could have utilized. This Manuel purportedly provides that when an alien is admitted for an improper length of time, the alien may simply bring the I-94 form to the local inspections unit to be corrected. Alternatively, the alien may send her I-94 form to the Service supervisor at the port of entry, and the supervisor will correct the error. *See* Defs.' Opp'n to Pls.' Mot. for Summ. J. at 2 (citing Inspector's Field Manual, Inserts at 15.12(c)); Austin T. Fragomen Jr. and Steven C. Bell H-1B Handbook (West 2001) at 3-401, § 3:69). Because these arguments are not germane to the ultimate resolution of this claim, the court declines to consider them further.

and the collateral effects, which plaintiffs claim are the result of the violation, are simply too speculative and attenuated to merit consideration. *See McBryde v. Comm. to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States*, 264 F.3d 52, 57 (D.C. Cir. 2001) (noting that some claims of injury "can be too vague and unsubstantiated to preserve a case from mootness") (citing *Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636-37 (D.C. Cir. 2000)); *cf. Spencer v. Kemna*, 523 U.S. 1, 18 (1998) (declaring a case moot because "there is nothing for us to remedy, even if we were disposed to do so").  While plaintiffs insist that this claim presents a live controversy because Qumri is continuing to suffer prejudice resulting from defendants' conduct, plaintiffs fail to show how the remedy they request–an order eliminating the unlawful presence Qumri has accumulated since January 4, 2002–redresses the instant violation or is fairly traceable to defendants' error.  Thus, plaintiffs' purported injury is insufficient to save this claim. *See Spencer*, 523 U.S. at 7 ("[T]hroughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'") (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).

It is well established that "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971); *McKinney v. Indiana Michigan Power Co.*, 113 F.3d 770, 772 (7th Cir. 1997); *Walker v. Houston*, 689 F.2d 901, 902 (9th Cir. 1982) ("A moot case is one in which the controversy between the parties is no longer live because one party is no longer concerned with the outcome.").  And, it is also clear that there is no "case or controversy if Plaintiff's purported injuries cannot be redressed through a court action." *Black v. Frank*, 730 F. Supp. 1087 (S.D.

Ala. 1990); *accord McBryde*, 264 F.3d at 55; *Aguirre v. S.S. Sohio Intrepid*, 801 F.2d 1185, 1189 (9th Cir. 1986).  Because the facts of this case present such a situation, the court finds that defendants are entitled to summary judgment in regard to the second of plaintiffs' two claims.

### III.  CONCLUSION

For the foregoing reasons, the court concludes that plaintiffs are entitled to judgment on their first claim, concerning the INS's denial of plaintiffs' petition for an H-1B extension of stay, and defendants are entitled to judgment on plaintiffs' second claim, concerning defendants' processing of plaintiffs' I-94 card, as that claim is moot. An appropriate order accompanies this Memorandum Opinion.

Henry H. Kennedy, Jr.
United States District Judge

Dated: October 30, 2003

29